UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SANDRA COOKENMASTER,
MARK COOKENMASTER,

        Plaintiffs,

                                     Case Number 07-13947-BC
v.                                    Honorable Thomas L. Ludington

KMART CORP.,

        Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On September 18, 2007, Plaintiffs Sandra Cookenmaster and her husband, Mark Cookenmaster, filed a complaint [Dkt. # 1] against Defendant Kmart Corporation. Plaintiffs filed their amended complaint [Dkt. # 7] on October 30, 2007, to correct the numbering of the counts, and to attach an exhibit inadvertently omitted from the initial complaint. Plaintiff Sandra Cookenmaster alleges federal and state causes of action arising out of Defendant's termination of her employment. Plaintiff Mark Cookenmaster alleges a derivative loss of consortium cause of action based on Plaintiff Sandra Cookenmaster's claims. Because the majority of the claims pertain only to Plaintiff Sandra Cookenmaster, she will be referred to as "Plaintiff."

Under count I, Plaintiff alleges that Defendant terminated her employment because of her age, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 *et seq.* Under counts II and III, Plaintiff alleges that Defendant terminated her employment because of her disability, and, in addition, failed to provide her with reasonable accommodations, in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101, *et seq.*, and the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws §§ 37.1101, *et seq.* Under count

IV, Plaintiff alleges that Defendant interfered with the benefits that she was entitled to, and retaliated against her for exercising her rights, in violation of the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601 *et seq.*  Under count V, Plaintiff alleges state law claims for intentional and negligent infliction of emotional distress.  Under count VI, Plaintiff Mark Cookenmaster alleges his claim for loss of consortium under state law.

On July 14, 2008, Defendant filed the motion for summary judgment currently before the Court.  On August 4, 2008, Plaintiffs filed a response to the motion [Dkt. # 38], and on August 13, 2008, Defendant filed a reply [Dkt. # 42].  The Court held a hearing on the motion on September 18, 2008.

I

Plaintiff Sandra Cookenmaster ("Plaintiff") was an employee at Kmart Store 4091, District 580, in Bay City, Michigan for approximately thirty-five years.  Throughout her employment, Plaintiff worked in various departments, including toys, sporting goods, replenishment, jewelry, soft goods, and as a cashier.  Most recently, Plaintiff worked full-time in the replenishment department; she was transferred to that department in August 2005, from her position as department manager for ladies apparel.  Defendant terminated Plaintiff's employment on August 15, 2006, just a few months before Plaintiff alleges she would have been entitled to receive full retirement benefits.

In November 2005, Plaintiff sustained serious cervical and shoulder injuries due to a car accident unrelated to her work duties.  As a result of her injuries, Plaintiff was unable to return to work until August 15, 2006.  She remained on a leave of absence from her job with Defendant until that date.  Throughout her leave of absence, Plaintiff kept Defendant informed about her medical status.  On August 14, 2006, Plaintiff informed Defendant's human resources department that her

doctor had approved her return to work with the restriction that she work as a cashier and not engage in any heavy lifting. Plaintiff also informed Defendant that she would need two additional surgeries after returning to work, including one on September 8, 2006. Defendant advised Plaintiff to return to work on August 15, 2006 at one o'clock in the afternoon.

When Plaintiff arrived for work on August 15, 2006, she met with Patricia Cook, Defendant's human resources manager, in her office. Steve Carlson, the district manager, and Daryl Blackhurst, the current store manager, who became responsible for the position after Tom Carlson ("Carlson"), were also present at the meeting. At this meeting, Defendant, for the first time, informed Plaintiff that her employment was terminated. Upon learning this information, Plaintiff abruptly left the office. According to Plaintiff's testimony, when she left the office, Cook followed her and indicated that they needed to talk. According to Defendant, it intended to offer Plaintiff an opportunity to reapply for part-time employment, but was unable to do so because Plaintiff left the meeting abruptly.

After the meeting, Plaintiff was devastated. She felt she had been "lured to work and lied to repeatedly." According to Plaintiff, while she was on leave, Carlson presented her with a 35-year ring and pin and indicated the store would "have a 35-year breakfast for you, or party, or whatever, when you come back." The new store manager, Daryl Blackhurst, met Plaintiff at a party during her leave and did not inform her that she was going to be terminated. Plaintiff was "hysterical, shocked, and crying over [the] unexpected news." She asserts that it is now hard for her to face people; she is embarrassed, depressed, and humiliated. She is not having intimate relations with her husband. She is worried about her finances, is in shock, and has extreme stress.

On approximately January 4, 2006, while Plaintiff was on a leave of absence, Kmart stores

-3-

across the country designated 5,916 full-time employees to be terminated as part of a "nationwide workforce adjustment." Ultimately, sixty full-time employees were terminated in District 580, and four full-time employees were terminated in the Bay City store. According to Defendant, the workforce adjustment was necessitated by economic concerns. In 2002, Kmart sought bankruptcy protection and later emerged in March 2005, with Sears, Roebuck & Company as its new owner. In December 2005, Kmart initiated a workforce adjustment program because it determined that its overall ratio of full-time to part-time associates was too high, as compared to some of its competitors and its sister company, Sears. Kmart believed a workforce adjustment would create a more desirable mix of part-time and full-time workers, leading to cost savings, scheduling flexibility, and uniformity in staffing between stores with similar sales volumes.

Kmart finalized a workforce adjustment program in mid-December 2005, and implemented it in January 2006. Under the program, stores that had an excess number of full-time associates were required to reduce their full-time headcount to reach an approved level. Kmart developed Workforce Adjustment Guidelines ("WFAGs") to be used during the process. WFAGs contained instructions for each designated "store coach" to use in determining which full-time associates would be terminated as part of the workforce adjustment. Kmart's WFAGs instructed store coaches that they were required to rate each full-time employee based on "observed, objective job-related performance." Each store was required to terminate the number of employees necessary to reach the approved level, based on which employees received the lowest ratings. In addition, the WFAGs also provided that "[w]orkforce decisions must be based on objective job-related criteria and must not be based on race, color, religion, sex, national origin, age, or disability."

The WFAGs further indicated that full-time employees on leaves of absence were "to be

included in the selection process," and that "the fact of the [leave of absence] or restriction is not to be considered as a rating factor." The WFAGs also provided that employees on leaves of absence who were designated to be terminated "due to their position in the rankings should not be terminated until returning to active status."

In addition to the WFAGs, store coaches were provided with an "Associate Performance Recap" form ("recap form"), which contained additional instructions on carrying out the evaluation process. The recap form required store coaches to evaluate employees based on several categories of work performance, and to assign a score, ranging from one to four, to each category. The four categories were: (1) customer service, (2) teamwork, (3) demonstrated work habits, and (4) position specific requirements. In addition, a score ranging from one to four, entitled "last appraisal score," was assigned based upon the score an employee had received in his or her last annual review.

Annual reviews rated employees in five basic categories. A total of twenty-two points were available in each of the following categories: (1) core expectations (six points), (2) customer service (four points), (3) teamwork (four points), (4) demonstrated work habits (four points), and (5) position specific requirements (four points). For the recap form, an employee's annual review score was converted to a score ranging from one to four based on the following: 21 to 22 resulted in a 4, 17 to 20 resulted in a 3, 12 to 16 resulted in a 2, and 11 or lower resulted in a 1.

To calculate each employee's final rating on the recap form, the store coach was required to average the converted score from the last appraisal score with the four new evaluation scores. The highest possible rating would be a 4.0, resulting from scores of four in all five categories, divided by the twenty possible points. The employees with the lowest scores were to be terminated according to the number of full-time employees required to be terminated.

Carlson was the store manager and store coach at the Bay City store, and was responsible for ranking his full-time associates pursuant to the instructions of the WFAGs and recap form. Carlson was obligated to terminate four of eighteen full-time associates in the Bay City store, based on the store's sales volume and the corresponding approved number of full-time employees. According to Carlson, he followed Kmart's WFAGs, utilized the recap form, and did not rely on any protected characteristics to rate all full-time associates in the store.

The fourteen full-time retained associates retained at the Bay City store were the following: Keith Ball (age 44), Helen Bell (age 48), Audrey Boucher (age 52), Leroy Campell (age53), Grace Cichocki (age 50), Patricia Cook (age 46), Linda Corneya (age 47), Dorothy Elkowitz (age 64), Patricia Erickson (age 59, disabled), Michelle Goretski (age 39), Marsha Johnroe (age 55), Diane Johnstone (age 39), Rebecca Mushatt (age 43), and Rick Trudell (age 47).

The four terminated full-time associates, who had the lowest final ratings on the recap form, were the following: Plaintiff Sandra Cookenmaster (age 53), Rose Elwell (age 45), Darleen VanOchten (age 47), and Elwood Wilcox (age 59).

Carlson prepared annual reviews for Plaintiff from 2001 through 2004. Plaintiff received seventeen points on her 2004 evaluation, with thirteen of those points coming from the four categories that overlap with the recap form. Plaintiff's 2005 annual review was due in November 2005, but was never fully completed because her leave of absence began around that time. Karen Jamrog ("Jamrog"), an assistant manager, filled out the review form in preparation of Plaintiff's review, but did not sign it. Neither Plaintiff, nor the store manager, Carlson, signed the form. Under Defendant's usual practice, Plaintiff, Carlson, and Jamrog would have signed the form in a meeting, in order to complete Plaintiff's annual review.

When Jamrog filled out Plaintiff's 2005 review form, she assigned Plaintiff a score of eighteen, with thirteen of those points coming from the four categories that overlap with the recap form. However, at some point, alleged by Defendant to be during November 2005, Carlson changed Plaintiff's "demonstrated work habits" score and lowered it from a four to a two. Thus, Plaintiff's modified score was only sixteen points, with eleven of those points coming from the four categories that overlap with the recap form. Carlson testified that the store manager generally had authority to change scores given by assistant managers during annual reviews. Carlson also testified that normally a new review form would be completed so that a changed score was not apparent on the form.

When Carlson ranked Plaintiff for purposes of the workforce adjustment, he converted her "last appraisal score" from her incomplete 2005 annual review, rather than the last completed annual review in 2004. In addition, he used the sixteen points he had edited the review form to reflect, rather than the eighteen points Jamrog had originally credited Plaintiff. This resulted in a converted score of two on the recap form, rather than a converted score of three, which would have been the result if Carlson had used the seventeen points from the 2004 annual review of Plaintiff or the eighteen points from Jamrog's 2005 annual review of Plaintiff. Thus, Plaintiff's final rating on the recap form was a 2.4 rather than a potential 2.6. Of the four employees terminated, the highest score was a 2.6. In addition, when Carlson rated Plaintiff across the four categories that overlapped with the annual review categories, he only assigned her ten points.

Defendant offered the three other terminated employees the opportunity to return to work for Defendant as part-time, rather than full-time, employees. When Plaintiff was terminated, she did not immediately receive this offer because of her abrupt departure from the termination meeting,

although she eventually heard about the possibility. The WFAGs indicate that terminated employees may reapply for part-time employment, and a script that Defendant gave store managers to follow when terminating employees provided that the terminated associate is "encouraged [] to reapply to any open available positions in the store."

At her deposition, Plaintiff testified that she had never experienced discrimination or harassment on the basis of age during her many years of employment with Kmart. Plaintiff also testified that no one ever made any comments to indicate that age played any part in the workforce adjustment decisions. Likewise, Plaintiff indicated that she had previously been injured at work, or outside of work, several times during her employment, that she had received worker's compensation, and that Defendant had always accommodated her work restrictions when necessary.

Subsequent to the workforce adjustment, Dawn Johnstone took over Plaintiff's duties in replenishment. In addition, Defendant hired several new part-time cashiers of varying ages. Defendant hired Benjamin Mackey, age 22, to work as a part-time cashier on February 1, 2006. Defendant also hired at least one new part-time cashier at least forty years of age. As of March 2008, Defendant had not hired any new full-time employees, with the exception of two salaried pharmacy professionals.

## II

Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). A fact is "material" if its resolution affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics and Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party bringing the summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252. The party who bears the burden of proof must present a jury question as to each element of the claim, *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000), rather than raise only "metaphysical doubt as to the material facts." *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

III

A

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1). Ultimately, to prevail on an age discrimination claim, a plaintiff must prove she was the victim of intentional discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000); *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 713 (6th Cir. 2006). A plaintiff may rely on direct or circumstantial evidence to demonstrate intentional discrimination. *See Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000).

When a Plaintiff does not advance direct evidence of discrimination, the three-part burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to allow a plaintiff to prove discrimination through inference. *See Johnson*, 215 F.3d at 573; *Grosjean v. First Energy Corp.*, 349 F.3d 332, 335 (6th Cir. 2003). In contrast, when a plaintiff presents direct evidence of discrimination, a court need not employ the *McDonnell Douglas* burden-shifting framework, because the direct evidence eliminates the need for an inferential demonstration of discrimination. *See Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 707 (6th Cir. 1985); *Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 721 (6th Cir. 2004).

Under the three-part burden-shifting analysis of *McDonnell Douglas*, a plaintiff must first

-10-

establish a prima facie case by showing: (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the job, and (4) that the employer hired a job applicant outside the protected class after the plaintiff was rejected.  *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1464 n.6 (6th Cir. 1990).  In age discrimination cases, the protected class includes "all workers at least 40 years old," and the fourth element is modified to only require "replacement by a significantly younger person," rather than someone outside the protected class.  *Grosjean*, 349 F.3d at 335 (internal citations omitted); *id.* at 340 (finding that "an age difference of six years or less between an employee and a replacement is not significant").

Moreover, in workforce reduction cases, the fourth element of the prima facie age discrimination showing is "supplanted by a requirement that the plaintiff proffer 'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [the plaintiff] for discharge for impermissible reasons.'" *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1126 (6th Cir. 1998) (citing *Barnes*, 896 F.2d at 1465).  A plaintiff may satisfy the fourth element by advancing circumstantial evidence demonstrating that she was treated less favorably than a similarly situated, significantly younger employee.  *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1048 (6th Cir. 1998)).  Ultimately, "the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age." *Gragg v. Somerset Technical Coll.*, 373 F.3d 763, 767-68 (6th Cir. 2004) (quoting *Barnes*, 896 F.2d at 1466).

A defendant engages in a work force reduction when "business considerations cause an employer to eliminate one or more positions within the company." *Barnes*, 896 F.2d at 1465.  *See also Whitt v. Lockheed Martin Util. Serv., Inc.*, 209 F. Supp. 2d 787, 798 (S.D. Ohio 2002) (noting

that "economic concerns" justify a workforce reduction). Accordingly, if a defendant "replaces" an employee it has terminated, the defendant cannot be said to have terminated the employee as part of a work force reduction. *Barnes*, 896 F.2d at 1465. A person is "replaced" when "another employee is hired or reassigned to perform the plaintiff's duties." *Id.* In contrast, if "another employee is assigned to perform the plaintiff's duties in addition to other duties," the person is not replaced. *Id.* Nor is a person replaced when his or her work is "redistributed among other existing employees already performing related work." *Id.*

Second, after a plaintiff establishes a prima facie case, the defendant may respond by offering a legitimate, non-discriminatory reason for its employment action. *Grosjean*, 349 F.3d at 335 (internal citations omitted); *Reeves*, 530 U.S. at 142 (noting the defendant carries the burden of "production, not persuasion"). In a workforce reduction situation, the reason will "necessarily be the alleged reduction in force." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir. 1999).

Third, and finally, if the defendant offers a legitimate, non-discriminatory reason for the employment action, the plaintiff carries the ultimate burden to prove by a preponderance of the evidence that the defendant's offered reason was only pretext. *Grosjean*, 349 F.3d at 335 (internal citations omitted). "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000) (internal citation omitted). In the summary judgment context, "a plaintiff must produce enough evidence that a jury could reasonably reject the employer's explanation for its decisions." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 883 (6th Cir. 1996) (citing *Manzer v. Diamond*

*Shamrock Chems. Co.*, 29 F.3d 1078, 1083) (6th Cir. 1994)).

B

Plaintiff has not advanced any direct evidence that Defendant discriminated against her based on age. Thus, the *McDonnell Douglas* burden-shifting framework applies. For the purposes of summary judgment, Defendant does not dispute that Plaintiff can prove the first three elements of a prima facie case. Rather, Defendant argues that Plaintiff has not advanced direct, circumstantial, or statistical evidence tending to show that Defendant singled her out based on her age, as is necessary in workforce reduction cases. Defendant also argues that Plaintiff was not replaced by a significantly younger worker.

As a threshold issue, Plaintiff argues that the workforce reduction framework does not apply, because Defendant "replaced" her when it terminated her. *See Barnes*, 896 F.2d at 1465. Plaintiff argues that she was replaced because after she was terminated, Defendant transferred Dawn Johnstone to work in the replenishment department, the last department that Plaintiff worked in before she took her leave of absence beginning in November 2005. Plaintiff also advances evidence to show that Defendant hired several individuals to work part-time as cashiers, the only position that Plaintiff's doctors approved her to work in when she returned from her leave of absence.

Although various new and existing employees took on Plaintiff's responsibilities, that fact alone does not lead to the conclusion that she was replaced. Defendant received instructions from its corporate headquarters mandating that it terminate four full-time employees. Defendant was instructed to determine which four full-time employees' employment to terminate based on objective evaluations of each employee's work performance. Defendant did not take into account the department in which an employee worked when it made termination decisions. After conducting

-13-

the required evaluations, Defendant terminated the four full-time employees with the lowest evaluation scores, one of which was Plaintiff. With the exception of salaried pharmacy professionals, Defendant has not hired any full-time employees since terminating Plaintiff and the three other employees. Thus, Defendant did not hire or reassign any employees to Plaintiff's full-time position. Accordingly, this is a work force reduction case, requiring Plaintiff to provide direct, circumstantial, or statistical evidence of discrimination based on age, not simply that a significantly younger individual took her place. *Barnes*, 896 F.2d at 1465.

As previously mentioned, Plaintiff has not advanced direct evidence tending to show age discrimination. Plaintiff also has not advanced circumstantial evidence showing that she was singled out to be treated less favorably than any similarly situated, significantly younger employees. *See Gantt*, 143 F.3d at 1048. Similarly situated employees do not include part-time employees, because they were not considered for the workforce reduction. *See Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir. 1997) (finding that "full-time employees are simply not similarly situated to part-time employees" under the Pregnancy Discrimination Act). Six of the eighteen full-time employees considered for termination were outside of the protected class, or significantly younger than Plaintiff: Keith Ball (age 44), Patricia Cook (age 46), Michelle Goretski (age 39), Diane Johnstone (age 39), Rebecca Mushatt (age 43), and Rose Elwell (age 45). Of these, Defendant also terminated Rose Elwell.

Plaintiff claims that the six similarly situated, significantly younger employees were treated more favorably because Carlson did not give any of them a "false" score when he completed their recap forms. For each employee other than Plaintiff, Carlson used the most recent annual review form to determine the "last appraisal value" for the recap form. Plaintiff's last, fully completed

-14-

annual review was from November 2004, yet, Carlson used Plaintiff's annual review score from November 2005, which was not signed by Plaintiff, himself, or Jamrog. Carlson testified in his deposition that he did not know why he used the 2005 review score. (Carlson Dep. 49:5-50:23, Feb. 26, 2008.) Moreover, for the "last appraisal value," Carlson did not use the scores that Jamrog had originally assigned to Plaintiff in November 2005, but the scores that he had edited the review to reflect.

In addition, when Carlson rated Plaintiff's observed work performance in the four categories on the recap form, he rated Plaintiff lower than Plaintiff's 2004 review, Plaintiff's 2005 review as assessed by Jamrog, and Plaintiff's 2005 review as assessed by Carlson. In his deposition, Carlson could not explain why he rated Plaintiff lower on the recap form than he had rated her in November 2005, even though he had not worked with Plaintiff since that time. (*Id.* at 52:8-54:23.) Depending on which set of scores Defendant used to calculate Plaintiff's rating, Plaintiff could have achieved an average score higher than 2.6 on the recap form, in which case she would have avoided being terminated as part of the workforce reduction.

Arguably, these facts establish that Plaintiff was treated differently than the similarly situated, significantly younger employees considered for termination. However, Plaintiff has not advanced any evidence that Carlson compiled her overall score differently because of her age. If anything, Carlson compiled Plaintiff's score in a manner different from the other employees because she was the only employee with an incomplete review in her file. *See Andrezyski v. Kmart Corp.*, 358 F. Supp. 2d 511, 517 (W.D. Va. 2005) (plaintiff could not establish a prima facie case even though she alleged her evaluation score was artificially low, because no evidence indicated that any artificiality was due to unlawful discrimination). *Compare Walton v. Kmart Corp.*, No. C 07-0707

PJH, 2008 WL 1809075 (N.D. Cal. Apr. 22, 2008) (plaintiff established a prima facie case under a California law prohibiting age discrimination in employment when the defendant could not adequately explain how it arrived at the plaintiff's rating).

Similarly, Plaintiff argues that the fact that she was the only one of the four terminated employees who did not receive an offer to reapply for a part-time position provides evidence of discrimination. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998). However, one of the other employees terminated, Elwood Wilcox, was also a member of the protected class and did receive an offer to reapply for a part-time position. Thus, the fact that Plaintiff did not receive an offer does not tend to show that Defendant discriminated against her based on her age.

Plaintiff also specifically indicated that she believed Diane Johnstone had been favorably treated as she was generally a "favorite" employee of Karen Jamrog's. However, Plaintiff merely contends that Jamrog favored Johnstone because she had worked with her previously, at another store, and that they were close friends. Plaintiff did not advance any evidence that Karen favored Johnstone over Plaintiff based on age.

Lastly, Plaintiff does not advance any statistical evidence tending to show age discrimination. In the Bay City Kmart store, Defendant considered eighteen full-time employees for termination. Sixteen of these employees were within the protected age class. Before the termination of four full-time employees, the average age of a full-time associate was 49.4. After the terminations took place, the average age for a retained associate was forty-nine, and the average age for a terminated associate was fifty-one. The two-year age difference between retained and terminated employees is not significant.

Plaintiff has not advanced any evidence, direct, circumstantial, or statistical, tending to show that Defendant singled her out to be terminated based on age. Accordingly, Plaintiff has not established a prima facie case of age discrimination. Thus, as a matter of law, no finder of fact could determine that Defendant discriminated against Plaintiff in violation of the ADEA when it terminated Plaintiff.

Even if the law allowed Plaintiff to meet the final element of a prima facie case merely by showing that she was replaced by a significantly younger worker, Plaintiff is unable to demonstrate that fact. For the same reason this is a workforce reduction case, Plaintiff cannot show she was replaced by a significantly younger worker. Defendant did not hire any new employees or place current employees into the full-time position it eliminated. Thus, Plaintiff cannot have been replaced by a significantly younger worker, since she was not replaced. Plaintiff contends that Defendant hired Benjamin Mackey, age 22, to replace her as a cashier, but Mackey was hired on February 1, 2006, before Plaintiff ever communicated that she would be restricted to working as a cashier upon return from her leave of absence, and Mackey was only hired as a part-time employee. Moreover, in addition to Mackey, Defendant hired new part-time cashiers from within the protected age class. Plaintiff also asserts that Johnstone replaced her in the replenishment department. However, Johnstone was an existing employee to whom Defendant "redistributed" the "related work." *Barnes*, 896 F.2d at 1465.

Even if Plaintiff had advanced a prima facie case of age discrimination, she cannot rebut Defendant's legitimate, non-discriminatory reason for terminating her. Defendant explains that Plaintiff was terminated as a result of a workforce reduction. Accordingly, Plaintiff bears the burden to prove the workforce reduction is only a pretext for age discrimination. *Grossjean*, 349 F.3d at

335. Taking all the facts in the light most favorable to Plaintiff, she cannot prove pretext.

Plaintiff must prove the workforce reduction either (1) has no basis in fact, (2) did not actually motivate Defendant's conduct, or (3) was insufficient to warranted Plaintiff's termination. *See Wexler v. White's Fine Furtniture*, 317 F.3d 564, 574 (6th Cir. 2003). Defendant has advanced evidence to show a workforce reduction occurred. Defendant has also advanced evidence to demonstrate why Plaintiff was terminated as a result of the reduction. According to Carlson, Plaintiff had difficulty learning the functions of the remote module unit gun, failed to keep her departments organized and clean, did not complete job assignments thoroughly, accurately, or in a timely manner, and lacked a sense of urgency and willingness to initiate new tasks. Carlson did not consider her to be a bad employee, just that others were working with a greater level of expertise and efficiency.

Plaintiff advances evidence that Carlson gave her a "false rating," that Defendant did not terminate her until she returned from her leave of absence, and that she was the only terminated employee not offered an opportunity to reapply for a part-time position. None of this evidence suggests that age played a role in Defendant's decision to terminate Plaintiff's employment. In contrast, Defendant has produced credible evidence that it undertook a workforce reduction in January 2006, and that it terminated Plaintiff's employment because she was one of the four lowest ranked employees in the store. Based on this evidence, a jury could not "reasonably reject [Defendant's] explanation for its decisions" *Kocsis*, 97 F.3d at 883, and conclude that the workforce reduction was merely pretext for age discrimination.

Based on the above, the Court will grant Defendant's motion for summary judgment as to Plaintiff's ADEA claim.

C

As part of count I of her complaint, Plaintiff alleges that Defendant's conduct violated "plaintiff's rights to due process of law and to the equal protection of the laws guaranteed by the Fourteenth Amendment to the Constitution of the United States." However, Defendant is not a state actor, and Plaintiff does not allege state action. Thus, Plaintiff's Fourteenth Amendment claims fail as a matter of law. *See Mays v. Buckeye Rural Elec. Co-op., Inc.*, 277 F.3d 873, 880 (6th Cir. 2002) (citing *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999)). Indeed, Plaintiff's response to Defendant's motion for summary judgment "stipulates this claim should be dismissed." Thus, the Court will grant Defendant's motion for summary judgment on this claim.

II

A

The ADA prohibits discrimination against a qualified individual with a disability because of the disability. 42 U.S.C. § 12112(a). The ADA defines "disability" as a physical or mental impairment that substantially limits one or more of the major life activities of the individual," a "record of such and impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(2). Absent direct evidence of discrimination, a plaintiff proceeds to prove discrimination under the three-step *McDonnell Douglas* framework. *Jones v. Potter*, 488 F.3d 397, 403-04 (6th Cir. 2007).

First, a plaintiff must establish a prima facie case of discrimination by demonstrating: (1) he is disabled, (2) he is otherwise qualified for the position with or without reasonable accommodation, (3) he suffered an adverse employment decision, (4) his employer knew or had reason to know of his disability, and (5) his position remained open. *Brenneman v. MedCentral Health Sys.*, 366 F.3d

412, 417 (6th Cir. 2004) (internal citation and quotation omitted). The fifth element "may also be satisfied by showing that similarly situated non-protected employees were treated more favorably" by the employer. *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir.1995).

Similar to the final element of a prima facie case of age discrimination under the ADEA, the final element of a prima facie case in a workforce reduction situation is modified for claims under the ADA. To satisfy the fifth element, a plaintiff must show that she was singled out on the basis of her disability, as demonstrated through additional direct, circumstantial or statistical evidence. *Kvintus v. R.L. Polk & Co.*, 194 F.3d 1313 (table), 1999 WL 1000824, at *4 (6th Cir. 1999) (citing *Barnes*, 896 F.2d at 1465). Circumstantial evidence is evidence which demonstrates that similarly situated non-disabled employees were treated more favorably by the employer. *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 660 (6th Cir. 1990).

Second, after a plaintiff establishes a prima facie case, the defendant must produce a legitimate, non-discriminatory reason for its employment action. *Brenneman*, 366 F.3d at 417. Third, and finally, the plaintiff must rebut that reason by "demonstrat[ing] that the proffered reason was, in fact, a pretext for unlawful disability discrimination." *Id*. at 417-418 (internal citation omitted).

Similarly, the PWDCRA bars employers from "[d]ischarg[ing] or otherwise discriminat[ing] against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability . . . that is unrelated to the individual's ability to perform the duties of a particular job or position." Mich. Comp. Laws § 37.1102(b). To prove a prima facie case under the PWDCRA, "the plaintiff must show (1) that he is [disabled] as defined in the act, (2) that the [disability] is unrelated to his ability to perform his job duties, and (3) that he has been

discriminated against in one of the ways delineated in the statute." *Chiemelewski v. Xermac, Inc.*, 580 N.W.2d 817, 821 (Mich. 1998) (internal citation omitted); *Peden v. City of Detroit Police Dep't*, 680 N.W.2d 857, 862 (Mich. 2004). After a plaintiff sets out a prima facie case, the burden shifts to the defendant to respond with a legitimate, non-discriminatory reason for its employment decision. *Kerns v. Dura Mech. Components, Inc.*, 618 N.W.2d 56, 62 (Mich. Ct. App. 2000).

Although federal case law and regulations are more developed than Michigan law, measures of substantial similarity exist between the ADA and the PWDCRA. *See Peden*, 680 N.W.2d at 862; *Chiles v. Mach. Shop, Inc.*, 606 N.W.2d 398, 409 (Mich. Ct. App. 1999). Neither party has argued any meaningful difference between the two bodies of law; thus, the Court will treat Plaintiff's PWDCRA claims the same as her ADA claims.

B

For the purposes of summary judgment Defendant only disputes that Plaintiff has not met the requirements of a prima facie case of disability discrimination because Plaintiff does not advance any direct, circumstantial, or statistical evidence to show that Defendant singled out Plaintiff based on her disability. Defendant is correct that Plaintiff does not advance any direct or statistical evidence that she was discriminated against based on her disability. However, Plaintiff does advance circumstantial evidence demonstrating that Defendant treated similarly situated non-disabled employees more favorably.

First, as previously discussed in the context of the Plaintiff's ADEA claim, Plaintiff asserts that Defendant treated her differently than similarly situated non-disabled employees because Carlson gave her a "false" rating. Although Carlson's rating of Plaintiff does not support an inference of age discrimination in the ADEA context, it does support an inference of disability

discrimination under the ADA. As already recognized, Defendant confronted a unique situation when it was required to rank Plaintiff. Plaintiff was the only full-time employee with a half-completed review in her file, due to the fact that it could not be completed before Plaintiff began her leave of absence. Arguably, based upon some evidence of Defendant's practices, Defendant should have used Plaintiff's score from her last fully completed review in 2004 as her "last appraisal score" on the recap form, as Carlson used scores from completed reviews for all of the other full-time employees that he ranked. However, even if Carlson had utilized the higher review score from Plaintiff's completed 2004 review, Plaintiff still would have been terminated, because she would have had a final score of 2.6, the same score as another employee that was terminated. Thus, the "false" rating alone does not support an inference of disability discrimination.

However, Plaintiff also advances evidence that suggests that Defendant did not have an adequate justification for the scores that Carlson gave Plaintiff based on her observed work performance. On her 2004 annual review form, Plaintiff received thirteen points in the categories that overlapped with the recap form. According to Jamrog's 2005 annual review, Plaintiff also received thirteen points in 2005, and according to the edits made by Carlson, Plaintiff would have received eleven points in 2005. If Carlson had given Plaintiff ratings consistent with any of those reviews, and used the score from her 2004 annual review, Plaintiff would not have been one of the four lowest ranked employees, and would not have been terminated as part of the work force reduction. Carlson testified that he did not know why he gave Plaintiff lower scores on the recap form than he did in November 2005, when Plaintiff had not worked since that time. (Carlson Dep. 52:8-54:23) Logically, Carlson's rating of Plaintiff's observed performance should not have changed; the only thing that changed was that Plaintiff had begun a leave of absence. Thus, a

plausible inference can be drawn that Carlson lowered his rating of Plaintiff because she had begun a long-term leave of absence due to her disability.

Moreover, Plaintiff's evidence that she was the only one of the four terminated employees that did not receive an offer to reapply for part-time employment supports an inference of disability discrimination, even though it does not support an inference of age discrimination. In the ADEA context, another employee in the protected class had received the offer to reapply. In contrast, in the ADA context, Plaintiff advances evidence that she was the only disabled employee terminated,[1] and the only employee who did not receive an offer to reapply for part-time employment. Defendant admits that it did not make her an offer, but asserts that it had intended to do so, and only did not do so because she abruptly left the office after being terminated. However, Defendant never followed up with Plaintiff via a telephone call or letter. Thus, arguably, Defendant treated Plaintiff differently from similarly situated, non-disabled employees when it did not encourage her to apply for part-time employment. While Defendant's explanation for treating Plaintiff differently is plausible, a jury could reasonably infer that Defendant treated her differently based on her disability.

Plaintiff's evidence that Carlson had no explanation for why he rated her lower on the recap form than he did just before she started her leave of absence, combined with the "false" rating, and the fact that Defendant did not offer Plaintiff the opportunity to reapply for part-time employment, satisfies the final element of a prima facie case of disability discrimination. Because Plaintiff has satisfied the elements of a prima facie case, the burden shifts to Defendant to articulate a legitimate non-discriminatory reason for Plaintiff's termination. As discussed above, in relation to Plaintiff's

---

[1] One other full-time employee, Pat Erickson, was disabled and retained; she received the highest ranking in the store.

ADEA claims, Defendant asserts that it terminated Plaintiff as part of a workforce reduction, because she was one of the four lowest ranking, full-time employees.

Thus, the burden returns to Plaintiff to advance sufficient evidence to prove that the workforce reduction is merely pretextual. Plaintiff testified that she had not previously encountered any incidents of discrimination or harassment on the basis of disability during her thirty-five years working for Defendant. Plaintiff testified that no one at Kmart ever made any comments to indicate that her injuries played any part in Carlson's termination decision. Plaintiff testified that prior to her termination, Defendant had always worked with her to find work she could perform with all of her various medical limitations.[2]

On the other hand, Plaintiff provides evidence suggesting that Defendant's explanation for her rating on the recap form is questionable. Plaintiff also puts forth evidence that she was treated differently than the other three terminated employees; of the four terminated employees, Plaintiff was the only employee currently disabled, and the only employee not actively encouraged to apply for part-time employment. A reasonable argument may be adduced that Defendant did not offer her the opportunity to reapply because her disability required her to take a long leave of absence and Plaintiff had indicated that she would need more leave in the near future. Thus, Plaintiff raises a genuine issue of material fact that the workforce reduction was merely pretext for disability discrimination. Accordingly, the Court will deny Defendant's motion for summary judgment on this claim.

---

[2] Plaintiff has taken at least nine leaves of absence as a result of work-related injuries, and over thirty leaves of absence for nonwork-related injuries or illnesses. Plaintiff has spent approximately 3.3 years of her thirty-five year history with the company off work for injury or illness. She has also spent approximately 2.1 years working with restrictions.

C

The ADA imposes an affirmative duty on employers to provide "reasonable accommodations to the known physical or mental limitations" of their employees. 42 U.S.C. § 12112(b)(5)(a). The initial burden rests with the plaintiff to establish a prima facie case of discrimination based on failure to accommodate. *Gaines v. Runyon*, 107 F.3d 1171, 1176 (6th Cir. 1997). To establish a prima facie case, a plaintiff must show: (1) she is an individual with a disability within the meaning of the ADA, (2) she is otherwise qualified to perform the essential functions of the job at issue, with or without a reasonable accommodation, (3) her employer was aware of her disability, and (4) the employer failed to provide a reasonable and necessary accommodation for her disability. *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997); *Gaines*, 107 F.3d at 1175-76; *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996).

A plaintiff bears the initial burden of establishing that the accommodation she seeks is reasonable. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1187 (6th Cir. 1996). If the plaintiff establishes a prima facie case, the employer must then demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operation of its programs. *Gaines v. Runyon*, 107 F.3d 1175-76 (citing *Kocsis*, 97 F.3d at 883).

For purposes of summary judgment, Defendant only disputes that Plaintiff can meet the fourth prong of the prima facie case. Defendant asserts that Plaintiff cannot prove that it failed to provide a reasonable and necessary accommodation to Plaintiff because no reasonable accommodation was possible.

Plaintiff attempts to characterize the accommodation she sought as working in a cashier's position, with no heavy lifting. This characterization ignores the fact that Plaintiff's full-time

position was eliminated while she was on leave. Although Plaintiff was not aware that she was going to be terminated, when Plaintiff requested her accommodation, Defendant had already decided to make Plaintiff's termination effective when she returned to active duty. Defendant was under no obligation to create a new position for Plaintiff upon her return or to displace another full-time employee in order to accommodate Plaintiff as a cashier. *Monette*, 90 F.3d at 1187. *See also Mole v. Buckhorn Rubber Prods., Inc.*, 165 F.3d 1212, 1218 (8th Cir. 1999) (finding that a request for accommodation on the date of termination was a "request for reinstatement, not a timely request for on-the-job accommodations"). Thus, Plaintiff cannot state a prima facie case for failure to accommodate under the ADA. The Court will grant Defendant's motion for summary judgment on this claim.

III

A

The FMLA provides covered employees up to twelve weeks of leave upon, among other things, the occurrence of "a serious health condition" rendering the employee unable "to perform the functions of the [her] position." 29 U.S.C. § 2612(a)(1)(A), (D). A serious health condition includes an "illness, injury, impairment, or physical or mental condition" that requires "continuing treatment by a health care provider." 29 U.S.C. § 2611(11). To invoke FMLA leave, an employee need only give her employer notice of her request for leave and state "a qualifying reason for the needed leave"; she need not expressly designate the leave as FMLA leave. 29 C.F.R. § 825.208(a)(2).

Upon return to work and before the expiration of the twelve workweek period, an employee must either be restored to her position or, if unavailable, an equivalent position. 29 U.S.C. §

2614(a)(1).  Further, an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" guaranteed by the FMLA, and may not discharge or discriminate in any way against an employee for opposing practices that are unlawful under the FMLA.  29 U.S.C. § 2615.  An aggrieved employee may sue to enforce her FMLA rights on one of two theories: entitlement or interference, or retaliation or discrimination by an employer for resorting to leave granted by the FMLA.  29 U.S.C. § 2615(a).

## B

To succeed on an FMLA interference claim, a plaintiff must demonstrate that (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) the employee was entitled to leave under the FMLA, (4) the employee gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled.  *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003).[3]  An employee is entitled to no more protection under the FMLA than she otherwise would have received, such as no protection from generalized workforce reductions.  29 U.S.C. § 2614(a)(3)(B); *see also Hoge v. Honda of Am. Mfg., Inc*., 384 F.3d 238, 244 (6th Cir. 2004) (holding that "[a]n employee returning from FMLA leave is not entitled to restoration unless he would have continued to be employed if he had not taken FMLA leave").

For purposes of summary judgment, Defendant disputes that Plaintiff can prove the fifth prong of an FMLA interference claim.  Defendant asserts that Plaintiff was only entitled to benefits

---

[3]  Under the entitlement theory, intent is irrelevant because the entitlement is due if the statutory requirements are met.  *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003) (internal citations omitted).  In addition, interference is not actionable when "the employer has a legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct."  *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006) (internal citations omitted).

for twelve weeks, and had already received those benefits. After twelve weeks, Defendant was no longer under an obligation to maintain a position for Plaintiff. Defendant also asserts that an employee has no right to restoration after taking FMLA leave, unless she is able to perform the essential functions of the position or an equivalent position. *Williams v. Toyota Motor Mfg., Inc.*, 224 F.3d 840, 844-45 (6th Cir. 2000), *rev'd on other grounds*, 534 U.S. 184 (2002); *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 511-12 (6th Cir. 2006).

Plaintiff does not put forth any evidence to suggest that Defendant did not provide her with FMLA benefits for twelve weeks of her leave of absence. In addition, at the time of expiration of her twelve weeks of protected leave, Plaintiff was not able to perform the essential functions of her position or an equivalent position. *Williams*, 224 F.3d at 844-45. It is undisputed that Plaintiff did not attempt to return to work until approximately twenty-six weeks after expiration of her protected leave. *See Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 785 (6th Cir. 1998); *Hoge*, 384 F.3d at 246. Thus, Plaintiff's FMLA interference claims cannot succeed; no genuine issues of material fact preclude summary judgment. Accordingly, the Court will grant Defendant's motion for summary judgment on this claim.

## B

FMLA retaliation claims employ the *McDonnell Douglas* burden-shifting analysis. *Skrjanc v. Great Lakes Power Serv. Co*., 272 F.3d 309, 315 (6th Cir. 2001). A prima facie case of FMLA retaliation is established by providing evidence of the following three elements: (1) the plaintiff availed herself of a protected right under the FMLA, including notifying her employer of her intent to take leave, (2) she was adversely affected by an employment action, and (3) there was a causal connection between the exercise of the protected right and the adverse employment action. *Id.* at

314. "The 'causal link' between the protected activity and adverse employment action is demonstrated by showing that the employer would not have taken the adverse action 'but for' the employee's protected activity." *Agee v. Northwest Airlines*, 151 F. Supp. 2d 890, 896 (E.D. Mich. 2001) (internal citations omitted). Evidence that is relevant to causation includes "evidence that the defendant treated [the] plaintiff differently from a similarly situated employee or that the adverse action was taken shortly after the plaintiff engaged in the protected activity." *Smith v. Aco, Inc.*, 368 F. Supp. 2d 721, 732 (E.D. Mich. 2005).

Once a plaintiff has adduced evidence sufficient to make out a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse employment action. *Skrjanc*, 272 F.3d at 315. The Sixth Circuit requires employers to advance a rationale reasonably supported by particularized facts. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998). However, courts do not require an exhaustive and optimal decisional process by the defendant, and do not micro-manage employers. *Id.* at 807. Once the defendant has articulated a legitimate non-discriminatory reason, the burden again shifts to the plaintiff to demonstrate that the reasons given were pretext for the improper reason behind the adverse employment decision. *Skrjanc*, 272 F.3d at 315.

For the purposes of summary judgment, Defendant only disputes that Plaintiff can prove the third element of a prima facie case, that there was a causal connection between Plaintiff's exercise of her FMLA rights and her termination. At the time that Defendant made the decision to terminate Plaintiff, Plaintiff was on FMLA protected leave, because she had been on leave for less than twelve weeks. As previously discussed in the context of the ADA, Plaintiff advances evidence to show that Defendant treated her less favorably than other full-time employees who were not on leave at the

time that Defendant made its termination decisions. In rating Plaintiff on the recap form, Carlson used a score from Plaintiff's incomplete 2005 annual review, rather than her fully complete 2004 review. In addition, Plaintiff was the only employee not offered the opportunity to reapply for part-time employment. And most significantly, Carlson did not have an explanation for why he gave Plaintiff lower observed performance scores on the recap form than he did just before she started her leave of absence. Had Carlson used Plaintiff's score from her complete 2004 review, and scored her observed performance the same as he did in November 2005, Plaintiff would not have had one of the four lowest scores on the recap form. While not highly compelling, this combination of evidence is sufficient to allow a reasonable factfinder to infer that Defendant would not have terminated Plaintiff, "but for" her exercise of her FMLA rights. Thus, Plaintiff has established a prima facie case of retaliation under the FMLA.

Accordingly, the burden shifts to Defendant to produce a legitimate non-discriminatory reason for terminating Plaintiff. As under the ADEA and ADA, Defendant indicates that Plaintiff was terminated as part of a workforce reduction. In addition, Defendant provides several reasons to substantiate why Plaintiff received one of the four lowest ratings in the store.[4] Thus, the burden returns to Plaintiff, to demonstrate that Defendant's reasons are merely pretext for retaliating against her for exercising her rights under the FMLA. *Skrjanc*, 272 F.3d at 315.

Defendant argues that Plaintiff does not advance any evidence to show pretext. Defendant argues that Plaintiff's only evidence is "the pure happenstance of the proximity in time between her request for FMLA leave and her termination." "[T]emporal proximity is insufficient in and of itself

---

[4] Defendant also asserts that it did not have an obligation to retain Plaintiff at the expiration of her FMLA leave; however, at the time Defendant made the decision to terminate Plaintiff, she was still on protected leave. Moreover, it was Defendant's policy to not terminate employees until they had been on leave for at least one year, and Plaintiff had not yet been on leave for one year.

to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc*, 272 F.3d at 317. It is true that Plaintiff did not advance any direct evidence to show that Defendant's reasons for terminating Plaintiff were merely pretext; however, the same circumstantial evidence Plaintiff advanced to establish a prima facie case allows a fact finder to draw a reasonable inference of pretext.

Defendant also attempts to defeat Plaintiff's showing of pretext by citing the fact that Defendant was not required by law to retain Plaintiff after expiration of her protected leave. However, whether or not Defendant was required by law to retain Plaintiff does not affect whether it's motivation for terminating her was in fact pretextual. Thus, Plaintiff has raised a genuine issue of material fact as to whether Defendant retaliated against her for exercise of her rights under the FMLA, precluding summary judgment on this claim. The Court will deny Defendant's motion for summary judgment on this claim.

IV

To prove a claim of intentional infliction of emotional distress under Michigan law, a plaintiff must show: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Hayley v. Allstate Ins. Co.*, 686 N.W.2d 273, 276 (Mich. Ct. App. 2004). At a minimum, to sustain a claim of intentional infliction of emotional distress, the plaintiff must demonstrate outrageous conduct, which means:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to scream, "Outrageous!"

*Sawabini v. Desenberg*, 372 N.W.2d 559, 565 (Mich. Ct. App. 1985) (internal citations and

quotations omitted).  Initially, a court must decide in light of the specific circumstances whether the defendant's conduct might reasonably be regarded as so extreme and outrageous as to allow recovery.

Plaintiff has not raised any genuine issues of material fact with regard to her intentional infliction of emotional distress claim.  Plaintiff argues that Defendant's conduct was extreme and outrageous because Defendant waited to terminate Plaintiff until she returned from her leave of absence pursuant to corporate policy, and Defendant did not inform Plaintiff of its intention to terminate her.   Defendant points out that its policy allows employees to continue receiving benefits until they are able to return to work. While reasonable minds may differ over whether such a policy is ideal, such conduct by Defendant does not rise to the level of extreme or outrageous conduct. Plaintiff has not provided evidence to support at least one element of her claim for intentional infliction of emotional distress; thus, Defendant is entitled to summary judgment on this claim.

In addition, even if Michigan law recognizes a claim for negligent infliction of emotional distress[5], Plaintiff could not prevail without proving that Defendant's conduct was extreme or outrageous.   As discussed, Defendant's conduct surrounding Plaintiff's termination could not reasonably be regarded as extreme or outrageous. Thus, Defendant is entitled to summary judgment with respect to Plaintiff's claims of both intentional and negligent infliction of emotional distress.

V

"Loss of consortium includes loss of conjugal fellowship, companionship, services, and all

---

[5]  Defendant asserts Michigan courts do not recognize such claims. *See Rouse v. Pepsi-Cola Metro. Bottling Co.*, 642 F.Supp. 34, 37 (E.D. Mich 1985) (noting that Michigan courts generally do not recognize a cause of action for negligent infliction of emotional distress).  Plaintiff did not provide any legal authority to suggest Michigan would recognize such a claim.

other incidents of the marriage relationship." *Berryman v. K-Mart Corp.*, 483 N.W.2d 642, 646 (Mich. Ct. App. 1992) (citing *Oldani v. Lieberman*, 375 N.W.2d 778 (Mich. Ct. App. 1985)). "A claim of loss of consortium is derivative and recovery is contingent upon the injured spouse's recovery of damages for the injury." *Berryman.*, 483 N.W.2d at 646 (citing *Moss v. Pacquing*, 455 N.W.2d 339 (Mich. Ct. App. 1990)).

Accordingly, Plaintiff Mark Cookenmaster cannot recover for loss of consortium on any claims for which Plaintiff Sandra Cookenmaster does not recover damages. To the extent that the Court grants summary judgment on Plaintiff Sandra Cookenmaster's other claims, summary judgment is warranted on Plaintiff Mark Cookenmaster's derivative claim for loss of consortium. In addition, a claim for loss of consortium is not available under the ADA or FMLA. *See e.g.*, *Franz v. Kernan*, 951 F.Supp. 159, 162 (E.D. Mo. 1996); *Mohamed v. Marriott Intern., Inc.*, 905 F.Supp. 141, 159 (S.D.N.Y 1995); *Miller v. CBC Cos. Inc.*, 908 F.Supp. 1054, 1069 (D.N.H. 1995); *Orme v. Swifty Oil Co.*, No. IP 98-1494-C H/G, 2000 WL 682678, at *1 (S.D. Ind. Mar. 28, 2000). Thus, Plaintiff Mark Cookenmaster only maintains a cause of action for loss of consortium under the PWDCRA. *See Milnikel v. Mercy-Memorial Med. Ctr., Inc.*, 454 N.W.2d 132 (Mich. Ct. App. 1989).

## VI

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment [Dkt. # 28] is **GRANTED IN PART** and **DENIED IN PART**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: October 7, 2008

-33-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 7, 2008.

s/Tracy A. Jacobs
TRACY A. JACOBS